UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

═══════════════════════════════════════════

YVETTE M. REDDICK,

                                        Plaintiff,


          -v.-                                          5:08-cv-0995
                                                        (NPM/ATB)

NIAGARA MOHAWK POWER
COMPANY *doing business as*
National Grid,

                                        Defendant.

═══════════════════════════════════════════

APPEARANCES:

FOR THE PLAINTIFF:

SYRACUSE UNIVERSITY COLLEGE
 OF LAW                                 MICHAEL A. SCHWARTZ, ESQ.
Disability Rights Clinic
P.O. Box 6543
Syracuse, New York 13217-6543

FOR THE DEFENDANT:

BOND, SCHOENECK & KING, LLP              STEPHEN J. VOLLMER, ESQ.
One Lincoln Center                       KATHERINE A. RITTS, ESQ.
Syracuse, New York 13202-1355


Neal P. McCurn, Senior District Judge


*Memorandum, Decision and Order*

## *I.  Introduction*

          Presently before the court in this employment discrimination action is a

motion for summary judgment by defendant, Niagara Mohawk Power Company, doing business as National Grid ("National Grid") against plaintiff, Yvette M. Reddick ("Reddick"), seeking dismissal of the complaint in its entirety.  Reddick opposes the motion and National Grid replies.  Decision is rendered on the papers submitted, without oral argument.

## II.  Legal Standard

Summary judgment may only be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  See Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotations omitted) (quoting FED. R. CIV. P. 56(c)).  The court's role on a motion for summary judgment is not to resolve factual issues, but rather to determine "whether there are issues to be tried."  Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987) (internal quotations omitted) (quoting Heyman v. Commerce & Industry Ins. Co., 524 F.2d 1317, 1319–20 (2d Cir. 1975)).  Upon evaluating the pleadings and the record, the court must resolve all ambiguities and draw all rational factual inferences in favor of the party opposing summary judgment.  See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994).  However, when a non-moving party "fails to make a showing sufficient to establish the existence of an essential element to that party's case," summary judgment must be granted against that party.  See Tufariello v. Long Island R.R., 458 F.3d 80, 85 (2d Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986)).

## III.  Factual Background

Before setting forth the material facts not in dispute, upon which this court

relies in deciding the pending motion, it is necessary to review the local and federal procedural rules as well as the law in this circuit regarding the court's ability to deem admitted a statement of material fact.  This court's local rules requires a moving party to provide a Statement of Material Facts, setting forth in numbered paragraphs each fact about which it contends there is no genuine issue, including a specific citation to the record where the fact is established.  See N.D.N.Y. R. 7.1(a)(3).  The Local Rules further provide that an opposing party must submit a response to the moving party's Statement of Material Facts "by admitting and/or denying each of the movant's assertions."  Id.  Where a fact is denied, the opposing party must set forth a specific citation to the record where the factual issue arises.  Most importantly, the Local Rules emphasize that "[t]he court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  Id.

The Court of Appeals for the Second Circuit has held that district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).  However, where the record does not support the assertions in the Statement of Material Facts, "those assertions should be disregarded and the record reviewed independently" even where the opposing party fails to controvert them.  Id., at 74.

In accordance with the foregoing, the following facts are deemed admitted, except where otherwise noted.

Reddick suffers from ailments including pseudotumor cerebri, chronic migraine headaches, and uterine fibroids.  In June 2002, Reddick was hired by National Grid as a part-time customer service representative ("CSR").  Reddick

3

was employed at National Grid's Contact Center ("Contact Center") in Syracuse, New York as a CSR under the management of Theresa M. Overdyk ("Overdyk"). As a CSR, Reddick was represented by Local 97, International Brotherhood of Electrical Workers, AFL-CIO ("Union"). Employees at the Contact Center handle all types of customer calls, including calls regarding power outages and emergencies. Regular and consistent attendance is an important and essential function of the CSR position. As a result, employees are required to call the company when they will be absent and provide medical documentation to support their absences.[1]

National Grid has a lost-time policy that subjects employees with three or more absences that are not covered under the Family Medical Leave Act ("FMLA") to potential counseling or discipline. Under the company's Positive Discipline Program, employees subject to discipline for unwarranted absences are given counseling, oral and written reminders. The final step of the Positive Discipline Program entails placing an employee on a Decision Making Leave ("DML"). Employees placed on a DML are advised that they will be terminated if they have any further problems with their attendance over the duration of the DML.

Reddick participated in three coaching sessions regarding her poor attendance in 2004 and 2005. National Grid further contends that Reddick received an oral reminder in March 2005 for failing to abide by the company's

---

[1] Reddick objects in part to National Grid's contention that its medical documentation policy provides that employees must provide timely and appropriate medical documentation to support absences. In particular, Reddick argues, without citation to supporting evidence in the record, that the terms "timely" and "appropriate" are not defined as they relate to production of medical documentation.

call-in and medical documentation policies.  However, Reddick argues that National Grid does not provide an adequate definition or record of any "oral reminder" given.  In August 2005, Plaintiff received a written reminder for attendance problems.  In the following month, Reddick was absent from work after an exposure to tuberculosis.[2]  Reddick was given a PPD test for tuberculosis on September 24, 2005, and she was advised to return forty-eight to seventy-two hours later for the results.  Around the same time in September 2005, Reddick called National Grid nurse Pat Goodyear ("Goodyear") to discuss her exposure to tuberculosis.  Reddick contends that Goodyear advised her to stay home from work because of the exposure.[3]  However, Goodyear recalls advising an unidentified female employee with a positive PPD test for tuberculosis to contact a physician for further instructions.

Reddick's PPD test returned positive and on September 27, 2005 she received an x-ray, which was eventually read as negative.  See Dep. of Yvette M. Reddick, Nov. 18, 2009, 48:6-24, D.t. No. 40-5 ("Reddick Dep.").  Reddick was absent from work from September 23, 2005 through October 5, 2005.  See Reddick Dep., 47:20-48:1.

Reddick did not submit any medical documentation in support of her

---

[2] Reddick's son, with whom she shares a home, tested positive for tuberculosis on September 24, 2005.

[3] Reddick contends that Goodyear knew she was speaking with Reddick during their telephone conversation, citing a self-prepared transcript of a surreptitiously recorded conversation between Reddick and Overdyk in which Overdyk allegedly stated that Goodyear was aware that she was speaking with Reddick on the telephone.  Such evidence is, of course, inadmissible, and may therefore not be considered by this court when deciding the present motion.

extended absence from September through October 2005.  National Grid placed Reddick on a DML in December 2005 because of her continued absenteeism and failure to comply with its call-in and medical documentation policies.  Reddick objects to National Grid's contention that she failed to comply with medical documentation policies during this absence, arguing without citation to the record that National Grid does not adequately define acceptable medical documentation and that Goodyear's alleged instruction to miss work excused Reddick from the need to provide additional documentation.  As a condition of being placed on a DML, Reddick was given a final warning and advised that she would be terminated if she had any more unexcused absences.[4]

Reddick was absent on January 3 and January 6, 2006.  National Grid claims that Reddick never provided medical documentation supporting her January 6 absence, and that she did not provide medical documentation for her January 3 absence until January 19, 2006.  Reddick claims, without any support in the record, that National Grid has no clear policy defining adequate medical documentation as it pertains to absence reporting.  On February 7, 2006, Reddick attended a meeting with Overdyk, Union Representative Ted Skerpon, and Supervisor Jeanne Roloff.  At this meeting, Reddick purported to have medical documentation supporting her January 6, 2006 absence.  However, she never provided the document to National Grid personnel.  Ultimately, Reddick was terminated at this meeting as a result of her lost time record and continued failure

---

[4] Reddick contends that National Grid has no clear policies regarding termination procedures.  However, Reddick also admits that part of National Grid's policy is to terminate employees placed on a DML who have further absence-related problems.

to comply with other National Grid policies."[5]

Reddick filed a grievance regarding her termination that proceeded to final and binding arbitration before a neutral arbitrator.[6]  After a hearing and receipt of post-hearing briefs, the arbitrator found that National Grid did not discriminate against Reddick and had just cause for disciplining and terminating her.

Subsequently, Reddick commenced this action, alleging that National Grid violated the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act ("FMLA").  In her amended complaint,[7] Reddick claimed that National Grid violated Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 (2006), and Section 296 of the New York Executive Law, commonly referred to as the New York Human Rights Law ("NYHRL").  In particular, Reddick claims that National Grid deprived her of reasonable accommodations in the workplace and terminated her from employment on the basis of disability.

## IV.  Discussion

The ADA declares that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to [among other things] the advancement or discharge of employees . . . and other terms . . . of employment."  42 U.S.C. § 12112(a) (2006).  Establishing a prima facie case of discrimination under the ADA entails showing: (1) that the

---

[5] Reddick objects to this statement, claiming, without citation to the record, that the phrase "other [National Grid] policies" is vague and overly broad.

[6] Reddick ambiguously both objects and admits to this factual allegation.  Since her denial does not set forth a specific citation to the record pursuant to N.D.N.Y. R. 7.1(a)(3), she is deemed to have admitted this allegation.

[7] Originally appearing pro se, Reddick later obtained counsel, after which she sought and was granted permission to file an amended complaint.  See Dkt. No. 33.

plaintiff is disabled within the meaning of the ADA; (2) the employer had notice of the plaintiff's disability; (3) the plaintiff is otherwise qualified to perform a position's essential functions with a reasonable accommodation; and (4) the employer refused to provide such an accommodation.  See DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 102 (2d Cir. 2010).[8]  Once a prima facie case of disability discrimination is established, the burden of production shifts to the defendant to provide, through the introduction of admissible evidence, a legitimate, non-discriminatory reason for the employment action, which if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action.  See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d 68, 72 (2d Cir. 1999) (citing Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)).  The plaintiff then has the burden of showing, through the introduction of admissible evidence, that the defendant's proffered reason for their actions was a pretext for discrimination, which "may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more."  Id.

National Grid argues that it is entitled to summary judgment on the entire complaint because the record shows that Reddick is not disabled, not otherwise

---

[8] Disability discrimination claims under the NYHRL are governed by the same legal standards as such claims under the ADA.  Accordingly, the court's analysis of Reddick's claims under the ADA applies equally to her NYHRL claims.  See Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004).  While the NYHRL defines disability more broadly than the ADA, see Reeves v. Johnson Controls World Services., Inc., 140 F.3d 144, 155 (2d Cir. 1998), because Reddick fails to establish other elements of her prima facie case, that distinction is immaterial here.

qualified for the CSR position, was not denied any reasonable accommodation, was not discharged because of a disability, and because National Grid's reasons for firing Reddick are not a pretext for discrimination.

Reddick argues that she is an individual with a disability under the ADA because she suffers from uterine fibroids that substantially limit her ability to reproduce, which is a major life activity.  Reddick further argues that she is a person with a disability under the NYHRL because she has been diagnosed with pseudotumor cerebri and migraines and because she was exposed to tuberculosis. Reddick argues that she could perform the essential functions of her job with the reasonable accommodation of intermittent leave, of which National Grid failed to provide.  Accordingly, Reddick argues, she has established that National Grid terminated her because of her disability.  Finally, Reddick argues that she can prove National Grid's proffered reason for her termination is a pretext for disability discrimination because there is a discrepancy between deposition testimony submitted by National Grid regarding one of her absences and a transcript, prepared by Reddick, of a recorded conversation between Reddick and Overdyk.

### A.  Individual with a Disability

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment."  42 U.S.C. § 12102(1) (2006).  The three-step test for determining whether an individual is disabled within the meaning of the ADA entails determining whether the plaintiff suffers from a mental or physical impairment, whether the life activity limited by the impairment constitutes a major life activity,

and whether the plaintiff's impairment substantially limits a major life activity. See Colwell v. Suffolk County Police Dept., 158 F.3d 635, 642 (2d Cir. 1998) (citations omitted).  Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i) (2009).  Additionally, reproduction is a major life activity within the definition of the ADA.  See Bragdon v. Abbott, 524 U.S. 624, 639, 118 S. Ct. 2196, 2205 (1998).  When assessing whether a disability substantially limits a major life activity, the court may consider various factors such as the nature, severity, and duration of the impairment.  See Copobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005).

Reddick contends that she is a person with a disability under the ADA because she was diagnosed with uterine fibroids, a condition that renders her unable to reproduce.  National Grid argues that the record does not conclusively indicate that Reddick's inability to reproduce is causally linked to her uterine fibroids.  In any event, National Grid argues, none of Reddick's absences related to its employment actions were attributed to her uterine fibroids.  Her absences in September and October 2005 were attributed to tuberculosis testing and her January 2006 absences were related to migraine headaches.

The Court of Appeals for the Second Circuit has held that there must be a "causal link between the specific condition which limits a major life activity and the accommodation required."  Felix v. N.Y. City Transit Auth., 324 F.3d 102, 104 (2d Cir. 2003).  Analyzing the text of the ADA, the Felix court found that for discrimination to be actionable, it "must be 'because of the disability.'"  See id. at 105 (quoting 42 U.S.C. § 12112(a) (2006)).  Any other impairments a plaintiff may have "that do not amount to a 'disability' as defined by [the ADA] do not

require accommodation under the ADA." Id.  Reddick has not shown a sufficient nexus between her uterine fibroids and her disability discrimination claim under the ADA.  Since none of her absences were related to her uterine fibroids, this physical impairment does not constitute a disability within the meaning of the ADA.

Reddick further contends that her pseudotumor cerebri and migraines and tuberculosis exposure constitute disabilities under the NYHRL.  National Grid argues that Reddick's tuberculosis exposure and migraine headaches are not protected disabilities under the ADA, but fails to address Reddick's arguments under the NYHRL.  "[I]n New York, the term 'disability' is more broadly defined."  Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 155 (2d Cir. 1998) (quoting State Division of Human Rights v. Xerox Corp., 480 N.E.2d 695, 698, 65 N.Y.2d 213, 218, 491 N.Y.S.2d 106, 109 (1985)).  Under the NYHRL, an individual can be disabled "if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities."  Id. (citation omitted). Here, Reddick argues that because her tuberculosis exposure and pseudotumor cerebri and migraines have been medically diagnosed and documented, she has established that she is disabled under the NYHRL.  The court need not reach this issue, however, because, as will be discussed below, Plaintiff cannot meet her burden to establish that she is a qualified individual with a disability or that National Grid's legitimate, nondiscriminatory reason for terminating Reddick is a pretext for discrimination, rendering immaterial the issue of whether she is disabled within the meaning of the NYHRL.

### *B.  Qualified Individual with a Disability*

Reddick argues that she can perform the essential functions of the CSR position with a reasonable accommodation of intermittent leave, which National Grid failed to provide.  Accordingly, Reddick argues, National Grid terminated her because of her disability in violation of the ADA and NYHRL.

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show "that with reasonable accommodation, [she] could perform the essential functions of the position sought . . . ."  See Stone v. City of Mount Vernon, 118 F.3d 92, 96 (2d Cir. 1997) (citing Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1515 (2d Cir. 1995)).  A position's essential functions are the fundamental duties of a job, "not functions that are merely 'marginal.'"  See id. at 97 (citations omitted).  Considerable deference is given to an employer's judgment as to a position's essential functions.  Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) (citing D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998)).  Furthermore, a written job description is considered as evidence of a position's essential functions.  See 42 U.S.C. § 12111(8) (2006).

The ADA defines "reasonable accommodation" to include, among other things, "job restructuring, part-time or modified work schedules . . . and other similar accommodations for individuals with disabilities."  Id. § 12111(9).  The plaintiff carries the burden of establishing that she can perform a job's essential functions, or that a reasonable accommodation exists that enables her to perform her position's essential functions.  See Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995).  Reasonableness is usually a question of fact; however, "summary judgment may be granted in cases where . . . the plaintiff's proposed accommodation 'would eliminate the essential functions of the job.'"

12

Aquinas v. Fed. Express Corp., 940 F. Supp. 73, 79 (S.D.N.Y. 1996) (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 141 (2d Cir. 1995)).  Regular attendance "is an essential function of virtually every job." Vandenbroek v. PSEG Power Conn. LLC, 356 F.App'x 457, 460 (2d Cir. 2009) (citation omitted).  While a leave of absence may constitute a reasonable accommodation, a request for leave may be unreasonable as a matter of law "where the request is for a very long leave of absence . . . [or, among other things,] where the absences are so sporadic that the employer has no way of knowing, from one day to the next, if their employee will even be reporting to work . . . ." See Powers v. Polygram Holding, Inc., 40 F.Supp.2d 195, 201 (S.D.N.Y. 1999).

Here, National Grid submits a written description of the CSR position, indicating that regular and consistent attendance is essential to the performance of this position.  Moreover, the parties agree that regular and consistent attendance is an essential function of the CSR position.  Further, considering that employees at the Contact Center handle all types of customer calls, including gas and electric outage emergency calls, it is beyond cavil that attendance is an essential function of the CSR position.  To be sure, there is a plethora of cases supporting the contention that excessive absenteeism eliminates an essential function of employment—attendance—and therefore such absenteeism does not constitute a reasonable accommodation as a matter of law.  See, e.g., Ramirez v. N.Y. City Bd. of Educ., 481 F.Supp.2d 209, 221–22 (E.D.N.Y. 2007); Mazza v. Bratton, 108 F.Supp.2d 167, 175 (E.D.N.Y. 2000); Bobrowsky v. N.Y.City Bd. of Educ., No. 97CV874(FB), 1999 WL 737919, at *4 (E.D.N.Y. Sept. 16, 1999), aff'd mem., 213 F.3d 625 (2d Cir. 2000); Mescall v. Marra, 49 F.Supp.2d 365, 374 (S.D.N.Y. 1999).  Moreover, when absences are sporadic and unpredictable, requests for

13

leave may be deemed unreasonable as a matter of law.  See Powers, 40 F. Supp.2d at 201.  See also Mullen v. City of New York, No. 02-Civ.-103SAS, 2003 WL 21511952, at *10 (S.D.N.Y. July 1, 2003).  Such is true even where the absences are due to a disability.  See Aquinas, 940 F.Supp. at 79 ("[A] disabled employee who cannot get to work as often as her employer requires is not otherwise qualified for her job under the ADA, and her employer is not required to make allowances for her absenteeism.").  On the other hand, "where the employer was aware that an employee's absences were related to a disability, . . . the employee's attendance record may be an impermissible pretext for the employee's disability." Morris v. City of New York, 153 F.Supp.2d 494, 502 (S.D.N.Y. 2001) (citations omitted).

Courts holding that excessive absences do not constitute a reasonable accommodation as a matter of law have generally focused on how frequent the employee was absent, and whether the absences were related to an ADA-protected disability.  See, e.g., Ramirez, 481 F.Supp.2d at 221–22; Bobrowsky, 1999 WL 737919 at *4; Mescall, 49 F.Supp.2d at 374.  One court held that a teacher who was absent for nearly a third of a year due to acute bronchitis "has not demonstrated that he can perform an 'essential function' of his employment position . . . ."  See Ramirez, 481 F.Supp.2d at 221–22.  Another court held that a plaintiff "failed to meet the attendance requirements of her position" when she missed forty-one days of work during a three-year probationary period of employment for reasons unrelated to an alleged mental disability.  See Mescall, 49 F.Supp.2d at 374–75.  Yet another court found that a teacher was not able to show that she was able to perform the essential functions of her job when she had seventeen absences over the course of a school year, only two of which were due

14

to an impairment that might be a disability within the meaning of the ADA. See Bobrowsky, 1999 WL 737919 at *4.

Reddick argues that she has proven that she can perform her job with or without a reasonable accommodation, since a requested leave of absence is a reasonable accommodation which can only be denied in unusual circumstances. She contends that her occasional need for leave as a result of her chronic headaches is a reasonable accommodation, because she does not require an unduly extensive leave nor is she unable to provide National Grid with notification as to when she would be absent.  Reddick claims that her absences are not erratic and unpredictable, since she can provide National Grid with notification of her absences due to the fact that they worsen during her monthly menstrual period. Furthermore, she states that her leave accommodation will not amount to flagrant absenteeism, emphasizing that from September 2005 through January of 2006, she only missed two days of work due to her disability, and her longest absence was an isolated incident predicated on Goodyear's alleged instructions to remain home after becoming exposed to tuberculosis, and she does not necessarily require leave every month.

National Grid argues that Reddick's requests for leave do not amount to a reasonable accommodation as a matter of law because they would eliminate an essential function of her job and because they are sporadic and erratic and are therefore unreasonable as a matter of law.  National Grid further argues that its duty to provide a reasonable accommodation does not relieve Reddick from her responsibility to comply with National Grid's rules concerning reporting and documenting absences.

Reddick exhibited a history of lost time and a failure to abide by National

15

Grid's attendance related policies.  Reddick was issued an oral reminder in March 2005 for past attendance problems, including fifty-five days of absences in the second half of 2004, at least twenty of which were non-FMLA related.[9]  In August 2005, Reddick was also given a written reminder for additional attendance related problems.  Furthermore, it is undisputed that Reddick was absent for seven days in September and October 2005 and that this extended absence was unrelated to her disability.

Reddick claims, without contradiction, that Overdyk has physically accepted medical documentation from her.  National Grid claims that Reddick failed to comply with its call-in and medical documentation procedures.  There is evidence that Reddick never presented any medical documentation for her September through October 2005 absence, but there is also evidence indicating that National Grid may have had medical documentation for that time period that they deemed inadequate.

Although Reddick may argue that she was not given a proper oral reminder for her lost-time record, she has not disputed that she had at least twenty non-FMLA related absences during the second half of 2004.  Furthermore, she had at least fourteen absences in 2005.  Reddick therefore had a total of at least thirty-four absences over the course of a year and a half.  Moreover, while Reddick has provided evidence that certain of these absences were related to her pseudotumor

_____

[9] Reddick claims that there is a dispute as to what constitutes an oral reminder and whether Overdyk ever issued her an oral reminder.  At her deposition, Overdyk testified that she recalls giving Reddick an oral reminder and documenting the date the reminder was given.  See Dep. of "Tess" Overdyk, Mar. 9, 2010, 75:13–15; 78:5–7, at Ex. G to Decl. of Ian MacAlister, May 10, 2010, Dkt. No. 44-3 ("Overdyk Dep.") .  She further testified that she does not recall the exact substance of the reminder she gave Reddick, but that she gave all employees similar oral reminders relating to lost time.  See Overdyk Dep. at 75:19–24.

cerebri migraine headaches, such evidence fails to support her argument that intermittent leave would be a reasonable accommodation in her case.  For example, Reddick submitted a medical certification, signed by a physician and dated December 23, 2004, which explained that Reddick was unable to work due to pseudotumor cerebri headaches from December 3 through 29, 2004.  Another note, dated April 28, 2005, stated that Reddick was unable to work, also due to headaches, from April 21 through 27, 2005.  See Ex. A to Reddick Aff.  Reddick again missed two days in the beginning of January 2006, allegedly due to headaches.  This evidence belies Reddick's assertion that her requested leaves of absence for her headaches are not erratic or unpredictable.  Where, as here, it is clear that the "absences are so sporadic that the employer has no way of knowing, from one day to the next, if their employee will be reporting to work," the "court may hold, without the need for a trial, that a requested leave of absence is an unreasonable request for accommodation[.]" Powers, 40 F.Supp.2d at 201.  Accordingly, Reddick has failed to show as a matter of law that she was a qualified individual with a disability, which is an essential element of her disability discrimination claims.  Nonetheless, even if Reddick could establish a factual question regarding this element, National Grid has established a legitimate, non-discriminatory reason for terminating Reddick, and Reddick has failed to show that this reason was a pretext for discrimination.

### C.  Legitimate, Non-discriminatory Reason for Termination

A plaintiff bringing a discrimination claim under the ADA must show that his or her disability was "a motivating factor" in the adverse employment action.  See Parker v. Columbia Pictures Indus., 204 F.3d 326, 337 (2d Cir. 2000).  The causal relationship between a disability and an adverse employment action "may

be established if the disability caused conduct that, in turn, motivated" the employment decision.  See Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994). Furthermore, "[f]ailure to consider the possibility of reasonable accommodation for . . . disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities." Borkowski, 63 F.3d at 143.

Reddick claims that her disability was a motivating factor for her termination, because as of April 2005, National Grid had notice of her migraines, and had she been granted the reasonable accommodation of intermittent leave, her related absences in January 2006 would not have led to her termination.  While National Grid acknowledges that Reddick's January 2006 absences were caused by headaches, it contends that it disciplined Reddick for absences unrelated to a disability.  National Grid argues that it had legitimate non-discriminatory grounds for terminating Reddick because she failed to comply with its absence reporting and medical documentation policies.

Reddick argues that a fact finder must decide whether her medical documentation was not adequate and timely, since National Grid never explained the necessary elements of acceptable medical documentation as it pertains to employee absence reporting, and the record does not contain information regarding National Grid's policy on what it considers adequate medical documentation.  Reddick relies on Konipol v. Rest. Assocs., No. 01 Civ. 7857(GEL), 2002 WL 31618825 (S.D.N.Y. Nov. 20, 2002) to support her assertion that she has provided enough evidence to permit a reasonable fact finder to determine that she provided adequate and timely medical documentation.  In Konipol, an employee submitted two medical documents to her employer to

support an extended absence.  <u>Konipol</u>, 2002 WL 31618825 at *1–2.  The court held that the employee "raised material issues of fact as to . . . the timeliness and completeness" of her medical documentation submissions under the FMLA.  <u>Id.</u> at *5.  National Grid is correct to point out that the <u>Konipol</u> analysis pertains specifically to FMLA certification, and therefore the analysis in that case in inapplicable here.

Moreover, there is a decision of an independent and neutral arbitrator, which is probative here.  After her termination, Reddick filed a grievance, which ultimately proceeded to arbitration before a neutral arbitrator.  After an eight-day hearing and receipt of post-hearing briefs, the arbitrator found that National Grid did not treat Reddick differently than any similarly situated employee and that it had just cause to discharge Reddick based on her "sub-standard attendance record."  Ex. E to Aff. of Theresa M. Overdyk, April 20, 2020, Dkt. No. 40-3.

National Grid argues that this determination should be considered highly probative to the issues of this case, including the assessment of whether its reasons for terminating Reddick are a pretext for discrimination.  It further contends that the arbitration award should not be disturbed, since Reddick has not presented evidence that the arbitration award was wrong as a matter of fact.

In support of its argument that the arbitration award should be considered probative to the issues of this case, National Grid relies on <u>Collins v. N.Y. City Transit Auth.</u>, 305 F.3d 113 (2d Cir. 2002).  In <u>Collins</u>, a Title VII action, the  Second Circuit held that "[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's

19

termination and the employer's illegal motive." Collins, 305 F.3d at 115.
Therefore, the court held, in order to survive a motion for summary judgment, the
plaintiff "must present strong evidence that the [arbitrator's] decision was wrong
as a matter of fact – e.g. new evidence not before the tribunal – or that the
impartiality of the proceeding was somehow compromised." Id., at 119.  Courts in
this circuit have applied this holding in the ADA context as well.  See Young v.
Benjamin Dev. Co., Inc., No. 03-Civ.-10209, 2009 WL 498933, at * 9 (S.D.N.Y.
Feb. 17, 2009); Sanzo v. Uniondale Union Free Sch. Dist., 381 F.Supp.2d 113,
118 (E.D.N.Y. 2005).

        Here, the arbitrator's decision was based on evidence provided by both
parties during eight days of hearings, at which Reddick was represented by
counsel, and was explained in a very thorough, forty-eight-page opinion that
reviewed the events leading up to Reddick's termination.  Thus, as in Young, the
arbitrator's decision here was "based on substantial evidence of an undisputedly
independent, neutral, and unbiased adjudicator."  Young, 2009 WL 498933, at * 9
 (quoting Collins, 305 F.3d at 119).  Further, Reddick's argument that she has
"new evidence" which will overcome the arbitrator's decision by establishing that
National Grid's reason for terminating her is a pretext for unlawful discrimination
is unavailing.  First, the evidence is inadmissible hearsay, and in any event does
not qualify as new evidence.  Reddick has not shown, nor can she show, that this
evidence was previously unavailable since it is a self-prepared transcript of a
conversation between Reddick and Overdyk that Reddick herself surreptitiously
recorded on December 7, 2005, almost a year before the arbitration hearings
commenced.  Moreover, even if admissible, the evidence does not support
Reddick's claim of pretext.  Reddick argues that the evidence contradicts

20

Goodyear's deposition testimony as to Reddick's telephone contact with her regarding Reddick's tuberculosis exposure.  Specifically, the evidence reflects that Overdyk allegedly told Reddick that she spoke to Goodyear and implied that Goodyear remembered the conversation and knew she was speaking to Reddick, and further, Overdyk allegedly stated, "obviously, if you are testing positive for TB, then you would not come to work."  Ex. E to Reddick. Aff.  In fact, the evidence actually supports National Grid's contention of a legitimate, nondiscriminatory reason for Reddick's termination.  The transcript goes on to reflect that Overdyk allegedly told Reddick that "[t]he reason you are being disciplined right now is because you do not have the medical documentation to support your absence[.] [I]t had [sic] nothing to do with Pat Goodyear[,] it has to do with documentation."  Id.  Thus, even if this transcript was admissible and was deemed "newly discovered" it does not, as Reddick argues, overcome the arbitrator's decision that National Grid had just cause to terminate her employment, nor does it establish pretext.  Accordingly, because the arbitrator's decision that there was just cause for National Grid's termination of Reddick is highly probative of National Grid's legitimate, non-discriminatory reason for terminating Reddick, and because Reddick has not met her burden to establish pretext, Reddick's disability discrimination claims against National Grid must be dismissed.

## *VI.  Conclusion*

In accordance with the foregoing discussion of the pending motion, it is hereby

ORDERED that the motion for summary judgment by defendant Niagara Mohawk Power Company, doing business as National Grid against plaintiff,

Yvette M. Reddick, <u>see</u> Dkt. No. 40, is GRANTED.

     The Clerk of the Court is directed to close the case accordingly.


     IT IS SO ORDERED.

DATED:     December 15, 2010
             Syracuse, New York

                                        Neal P. McCurn
                                        Senior  U.S. District Judge